# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 22-918V
## Filed: April 15, 2026

|  |  |
|---|---|
| SHIRLEY RUMPH, | Special Master Horner |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for petitioner.*
*Jamica Marie Littles, U.S. Department of Justice, Washington, DC, for respondent.*

### RULING ON ENTITLEMENT[1]

On August 17, 2022, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012).[2] (ECF No. 1.) Petitioner alleged that she suffered a Table Injury of "SIRVA," *i.e.* a shoulder injury related to vaccine administration, or alternatively a shoulder injury caused-in-fact by her vaccination, following the receipt of an influenza ("flu") vaccine on September 18, 2020. (*Id.*) For the reasons set forth below, I conclude that petitioner is entitled to compensation.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

## I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a), *amended by* 42 C.F.R. § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)    No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii)    Pain occurs within the specified time-frame;

2

(iii)    Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv)    No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence". § 300aa-13(a)(1). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their prima facie case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of

evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1).

## II.     Procedural History

In October of 2022, petitioner filed her medical records and a written statement followed by a Statement of Completion.  (ECF Nos. 6, 8; Exs. 1-8.)[3]  Thereafter, based on the allegations of the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU").  (ECF Nos. 9-10.)  However, in July of 2023, it was subsequently reassigned to the undersigned after respondent's counsel advised that the case may be too medically complex to meet the regulatory definition of SIRVA.  (ECF Nos. 15-17.)

Petitioner filed an expert report by Naveed Natanzi, D.O., in August of 2023.  (ECF Nos. 20-22; Exs. 10-12.)  The parties then attempted informal resolution (ECF Nos. 23-24), but they reached an impasse (ECF No. 25).  Accordingly, respondent filed his Rule 4(c) Report, accompanied by a responsive expert report by Geoffrey Abrams, M.D., in August of 2024.  (ECF Nos. 28-29; Exs. A-B.)  Respondent contended that petitioner's presentation is not consistent with a Table SIRVA and further argued that she had also not demonstrated causation-in-fact.  (ECF No. 29, pp. 12-22.)

After the expert reports were filed, the parties attempted informal resolution a second time (ECF Nos. 30-32), but they again reported reaching an impasse (ECF No. 33).  In December of 2024, petitioner requested that "the Court set additional litigation deadlines so that this case can be decided by the Court."  (*Id*.)  Thereafter, petitioner was directed to file a motion for a ruling on the written record, which she did in February of 2025.  (ECF No. 34.)  That motion is now fully briefed.  (ECF Nos. 36-37.)

Within their briefs, neither party objected to resolving entitlement on the existing record.  (ECF Nos. 34, 36, 37.)  However, they did differ on whether it is appropriate to also resolve damages as this juncture.  Although petitioner addressed damages in her motion on her own initiative (ECF No. 34, pp. 2-3 n.1, 33-40), respondent disputed that the issue is ripe for resolution (ECF No. 36, p. 1 n.1).  However, the only issue respondent raised was that petitioner had not yet been found entitled to compensation.  (*Id*.)  Respondent did not indicate that he wished to develop the evidentiary record further with respect to damages.  (*See id*.)

While it is the ordinary practice in this program to bifurcate the entitlement and damages phases of litigation, nothing prevents a special master from reaching both questions simultaneously in appropriate cases.  *E.g.*, *Chatman v. Sec'y of Health & Human Servs.*, No. 20-2064V, 2024 WL 3912832 (Fed. Cl. Spec. Mstr. July 19, 2024) (Chief Special Master issuing a combined ruling on entitlement and decision awarding damages).  In her reply, petitioner argued that I should reach the question of damages

---

[3] A transcribed copy of the medical records filed as Exhibit 7 were later filed as Exhibit 9.  (ECF No. 19.)

regardless of respondent's objection, noting respondent had been afforded the opportunity to address petitioner's damages.  (ECF No. 37, p. 2.)

In light of the above, this ruling will resolve the instant motion with respect to entitlement only.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  However, because petitioner has already fully briefed the issue of damages, the parties have twice attempted informal resolution, and respondent has not suggested that further evidence is necessary to assess petitioner's damages, an order to show cause will be issued contemporaneous to this ruling, requiring respondent to provide a brief showing cause why petitioner should not be awarded damages in the amount she requests.  I will issue a decision awarding damages once the issue is fully briefed.

### III.    Factual History

Petitioner received the vaccination at issue in this case, administered in her left deltoid, at a primary care encounter on September 18, 2020.  (Ex. 1, p. 3; Ex. 3, pp. 171-73.)  The purpose of the medical visit was "evaluation and management of chronic medical problems." (Ex. 3, p. 171.)  The history of present illness focused on petitioner's painful right hip and the musculoskeletal physical exam was limited to noting that petitioner was now ambulating with a cane. (*Id*. at 171-72.)  There were no documented complaints of left hand, arm, or shoulder pain at that time. (*See id*. at 171-73.)  In her written statement, petitioner indicated that "[w]hen I left the appointment, I continued to have pain and soreness in my shoulder.  This pain continued through the following days and varied in intensity . . . ."[4]  (Ex. 2, ¶ 9.)  Petitioner further stated that "[a]t the time I received the influenza vaccine, I had no orthopedic related issues in my left arm or shoulder." (*Id*. at ¶ 3.)

Respondent stresses, however, that petitioner had a prior history of left arm and shoulder complaints. (ECF No. 36, pp. 2-3.)  Specifically, in January of 2015, more than five years prior to the vaccination at issue, petitioner complained of an ache over her left deltoid that was exacerbated by movement as well as intermittent neck pain that radiated down her left arm to her hand accompanied by numbness and tingling. (Ex. 4, pp. 338, 341-42.)  Petitioner indicated that her neck pain occurred in short intervals and resolved spontaneously, noting that her left upper arm pain persisted even in the absence of neck pain. (*Id*.)  Additionally, petitioner reported that she was unable to lay on her left arm at night due to the pain. (*Id.*  at 342.)  A follow up cervical spine x-ray revealed bilateral joint hypertrophy from C3-C4 through C6-C7, which was moderate to severe and was noted to have progressed since 2003. (*Id*. at 354.)  At a yearly physical in April of 2015, petitioner confirmed that her left arm pain continued to persist. (*Id*. at 320, 324.)  However, petitioner was not interested in treatment beyond heat and home exercises, which she noted to be helpful. (*Id*. at 324.)  Respondent has not identified

---

[4] Petitioner's statement declares that it is made under penalty of perjury, but it is not notarized.  (Ex. 2, p. 6.)

any further treatment records for this complaint.  (*See* ECF No. 36, p. 3.)  Subsequently, however, petitioner's physician recommended in 2017 that petitioner receive a handicapped parking permit due to severe osteoarthritis of the spine and hips (Ex. 4, p. 356), and in 2019 petitioner noted when establishing care with a new physician that her arthritis was not generally bothering her, except for pain in the shoulders and hips "at times" (Ex. 3, p. 438).

Finally, on August 26, 2020, just one month prior to the vaccination at issue, petitioner telephoned her physician to report that she was experiencing left forearm and hand pain and numbness, noting "she might have slept on it wrong."  (Ex. 3, p. 178.)  However, only heat, topical rubs, and ibuprofen were recommended and no further follow up was documented.  (*See id*.)  Subsequently, during a "Love Call," a form of telephone check-in by the Senior Medical Center where petitioner received her primary care, petitioner reported on September 15, 2020, that she was "doing well."  (*Id*. at 174-75.)  And, as noted above, no complaint of left arm or shoulder pain was addressed at petitioner's September 18, 2020 medical encounter at which she received her flu vaccination.  (*See id.* at 171-73.)

Subsequent to petitioner's vaccination, an October 22, 2020 "Love Call" and an in-person encounter the next day included no complaint of left shoulder pain.  (Ex. 3, pp. 163-67.)  Notably, however, petitioner's October 23, 2020, encounter did not include any musculoskeletal physical exam, despite being an in-person encounter.  (*Id*. at 164-65.)  During her "Love Call," she had reported that she was "fair."  (*Id*. at 166.)  Petitioner recounted in her written statement two specific instances in which she felt particular pain with reaching, which she indicated occurred as early as September 26, 2020.  (Ex. 2, ¶¶ 10-11.)  Thereafter, on November 25, 2020, petitioner presented for a telehealth encounter and at that time reported for the first time "L[eft] arm still has pain after PNA shot."[5]  (Ex. 3, p. 156.)  However, her physician instead remarked that "[i]t sounds like it is L[eft] shoulder pain."  (*Id*.)  This encounter record is not otherwise informative.  (*See id.* at 156-57.)  According to later records, petitioner was supposed to have a follow-up x-ray, but this was apparently not ordered.  (*Id*. at 148.)  Petitioner did not explain in her written statement why she waited until late November to report her shoulder pain to her physician.  (*See* Ex. 2.)

At her next medical encounter, which was an in-person primary care visit of January 5, 2021, petitioner again reported "still having L[eft] arm pain."  (Ex. 3, p. 148.)  It is further remarked that she "[b]elieves it is after the pneumonia shot or flu shot that the pain came on."  (*Id.*)  It is separately noted that the pain had been ongoing for one to

---

[5] Neither party directly addressed the fact that this notation references a "PNA" shot.  In particular, respondent does not argue that this notation correlates onset of petitioner's shoulder pain to some injection other than the flu vaccine at issue (ECF No. 36, *passim*).  This is likely because petitioner's proffered vaccination record includes a handwritten note from her medical provider indicating that the September 18, 2020 influenza vaccine at issue was the only vaccine petitioner received in 2020.  (Ex. 1, p. 4.)  Accordingly, while "PNA" is an abbreviation likely referring to a pneumococcal vaccine, it is reasonable to conclude that this notation, though mistaking the type of vaccine at issue, is a reference to the September 18, 2020 vaccination.

two months, which would place onset in November or December of 2020.  (*Id.* at 150.)  Petitioner reported being able to get her arm over her head, but explained that it was painful.  (*Id*. at 148.)  She suggested that it "[f]elt like her shoulder got dislocated" and that she "[a]lmost cries at times."  (*Id*.)  Physical exam demonstrated pain when raising the left arm 180 degrees over her head, but good abduction and adduction as well as good internal and external rotation.  (*Id*. at 149-50.)  X-rays of petitioner's left shoulder were ordered.  (*Id.* at 150.)  The physician doubted any rotator cuff tear or dislocation and instead felt a tendinopathy was most likely.  (*Id*. at 149-50.)  Petitioner had a telehealth follow up with her primary care provider on January 28, 2021, at which time she was advised she had a likely tendinopathy, and she requested a referral to an orthopedist.  (*Id*. at 127-28.)

Petitioner then presented to an orthopedist on February 3, 2021.  (Ex. 5, p. 98.)  The history of present illness indicated that petitioner "presents for left shoulder pain which started after a flu vaccine.  She has had mild persistent pain with raising her arm above shoulder or reaching behind back.  No numbness or tingling.  She has not had any treatment yet so far."  (*Id*.)  On physical exam, petitioner's cervical spine range of motion was normal and a Spurling's test (for cervical radiculopathy) was negative.  (*Id*. at 100.)  Her left shoulder demonstrated flexion of 165 degrees and external rotation of 70 degrees, but internal rotation was noted to be "full."  (*Id*.)  She tested positive for signs of impingement.  (*Id*. at 101.)  She was diagnosed with left shoulder pain of unspecified chronicity and bursitis of the left shoulder for which she was proscribed a Medrol dose pack (a steroid treatment) and referred to physical therapy.  (*Id.*) Petitioner underwent x-rays of her shoulder and cervical spine in connection with this encounter.  (*Id*. at 121-22.)  However, the results were not discussed within the encounter record for this visit.  (*Id*. at 98-102.)

Petitioner began physical therapy on February 10, 2021.  (Ex. 3, pp. 124-25.)  She reported "onset of left shoulder [pain] in Sept 2020 when she received a flu shot.  S[ymptoms] worsened and spread throughout the left shoulder."  (*Id*. at 125.)  Upon her initial evaluation, petitioner had reduced range of motion in her left shoulder and reduced strength throughout her left upper extremity.  (*Id*.)  She had a positive Hawkins test (a test for shoulder impingement, also called a Hawkins-Kennedy test), but a negative Speed's test (for biceps tendon pathology) and a negative empty can test (for rotator cuff injuries).  (*Id*.)  Petitioner was limited by pain when reaching overhead or behind her back.  (*Id*.)  She was to be seen at physical therapy once a week for four to six weeks.  (*Id*. at 126.)

Petitioner returned to her orthopedist on April 7, 2021.  (Ex. 5, p. 73.)  At that time, she reported that her shoulder pain had improved overall and that physical therapy had helped.  (*Id*.)  She no longer had pain at rest but did have pain localized to her lateral shoulder with terminal abduction, flexion, and overhead activities. (*Id*.)  Her physical exam was essentially the same as her prior orthopedic encounter, except that flexion and external rotation had improved somewhat and tenderness at the biceps groove and a belly press test were specifically noted to have been negative.  (*Id*. at 75-76.)  However, at this encounter, the orthopedist reviewed the x-rays that had previously

7

been taken at the February 3, 2021 encounter. (*Id*. at 76.) The left shoulder x-ray showed no acute fracture or dislocation, but showed "[q]uestionable minimal deformity" potentially related to a prior trauma. (*Id*.) It also showed mild acromioclavicular joint osteoarthritis with minimal osteophyte formation of the glenoid. (*Id*.) The cervical spine x-ray showed

> Very mild anterolisthesis of C4 on CS, and very mild retrolisthesis of C6 on C7. No evidence of dynamic instability. The predental space is within normal limits. The prevertebral soft tissue is unremarkable. Multilevel degenerative disc disease involving almost all levels of the cervical spine, especially C5-6 and C6-7 where it is moderate overall. There is also mildly bulky paravertebral ossification at multiple levels, best demonstrated anteriorly, for which superimposed diffuse idiopathic skeletal hyperostosis is not excluded Bilateral uncovertebral joint osteoarthritis involving at least C4-5 through C6-7.

(*Id*.) The orthopedist maintained the diagnosis of left shoulder bursitis, now noted to be resolving, and added a diagnosis of multilevel degenerative disc disease of the cervical spine. (*Id*. at 77.) It was recommended that petitioner continue physical therapy and use over the counter pain medication as needed. (*Id*.) When petitioner returned to her primary care provider the next day, it was noted that she "[d]o[es] not feel she needs any other follow up."[6] (Ex. 3, p. 113.) Though this did not mark the complete resolution of petitioner's symptoms (*see, e.g.*, Ex. 5, p. 60; Ex. 2, ¶ 19), the remainder of the medical records are not significant to the issues discussed herein.

## IV.    Expert Opinions

After reviewing petitioner's medical history, petitioner's expert, Dr. Natanzi,[7] accepts petitioner's recollection that the onset of her shoulder pain occurred immediately following her vaccination. (Ex. 10, p. 3 (citing Ex. 2).) He also notes that her medical providers documented that she attributed her pain to her vaccination. (*Id*. (citing Ex. 3, p. 158; Ex. 5, p. 98).) Accordingly, he concludes that her presentation meets the onset criteria for a Table SIRVA. (*Id*.)

---

[6] Of note, although petitioner devoted attention in her motion for a ruling on the written record to substantiating petitioner's satisfaction of the six-month severity requirement (ECF No. 34, pp. 23-24), respondent has not raised any argument as to this point (ECF No. 36).

[7] Dr. Natanzi received his Doctor of Osteopathy from Western University of Health Sciences in Pomona, California. (Ex. 11, p. 2.) He completed a traditional rotating internship at Downey Regional Medical Center in Downey, California. (*Id*.) Dr. Natanzi went on to complete his residency in physical medicine and rehabilitation at the University of California, Irvine. (*Id*. at 1.) Thereafter, he completed fellowship training in interventional sports and spine medicine at Bodor Clinic in Napa, California. (*Id*.; Ex. 10, p. 1.) Dr. Natanzi is board-certified in physical medicine and rehabilitation and pain management, and he maintains his license to practice medicine in California. (Ex. 11, pp. 1, 4; Ex. 11, p. 1.) Currently, he serves as a staff physician at Veterans Affairs Long Beach Healthcare System; founder of the Regenerative Sports and Spine Institute; and medical director of Tova Surgical Center. (Ex. 11, p. 1; Ex. 10, p. 1.) In his clinical practice, Dr. Natanzi almost exclusively treats musculoskeletal issues. (Ex. 10, p. 1.)

Dr. Natanzi acknowledges that petitioner had a prior history of left arm pain in 2015; however, based on his review of the reported symptoms, physical exams, and x-rays, he opines that what petitioner experienced at that time was an acute cervical radiculopathy, *i.e.* a pinched nerve.  (Ex. 10, p. 3.)  He explains that "I do not believe that there was any significant or symptomatic pathology of the shoulder at this point, given the intact range of motion, no pain with palpation of the shoulder structures, and intact strength of the shoulder muscles/tendons."  (*Id*.)  Although cervical radiculopathy can cause pain in the deltoid, it is fundamentally different from a structural shoulder issue.  (*Id*. at 3-4)

Post-vaccination, however, petitioner's physicians documented reduced range of motion and signs of impingement, and she was ultimately diagnosed with bursitis.  (Ex. 10, p. 4 (citing Ex. 5, pp. 50, 73, 98).)  "Given the acute development of pain after vaccination, coupled with a hallmark SIRVA clinical finding of impingement and bursitis, it is far more likely than not that the vaccine is to blame for Ms. Rumph's shoulder pain."  (*Id*.)  Thus, Dr. Natanzi opines that petitioner meets the first and fourth SIRVA criteria, because her prior 2015 cervical radiculopathy cannot explain her post-vaccination symptoms, which are instead explained by structural shoulder issues rather than being related to the cervical spine.  (*Id*. at 4-5.)  Additionally, a cervical radiculopathy would not explain her post-vaccination presentation.  (*Id.*)

Respondent's expert, Dr. Abrams,[8] does not agree that petitioner's pre-vaccination presentation was solely due to cervical radiculopathy.  (Ex. A, p. 5.)  Instead, he opines that it was a "mixed picture" of cervical and shoulder pathology.  (*Id.)*  In particular, petitioner's report that she was unable to lay on her arm to sleep and her report that she had arm pain even in the absence of neck pain are inconsistent with cervical radiculopathy.  (*Id*.)  Additionally, whereas Dr. Natanzi presented that history as acute, Dr. Abrams notes that petitioner reported continued pain at later encounters and also experienced an additional episode of hand and arm pain just prior to the vaccination at issue.  (*Id*.)  Dr. Abrams acknowledges, however, that petitioner had limited evaluation of her condition – for example no MRI – "making it difficult to ascertain the source of her pre-vaccination symptoms."  (*Id*. at 6.)

Dr. Abrams also stresses that petitioner did not immediately report post-vaccination shoulder pain to her physician and that her physical examinations do not show reduced range of motion until about four months post-vaccination.  (Ex. A, pp. 5,

---

[8] Dr. Abrams received his medical degree from the University of California, San Diego.  (Ex. B, pp. 1-2.)  He completed a surgical internship and a residency in orthopedic surgery at Stanford University.  (*Id.* at 1.)  Thereafter, he completed a fellowship in orthopedic sports medicine at Rush University Medical Center in Chicago, Illinois.  (*Id.*)  Dr. Abrams is board-certified in orthopedic surgery with a subspecialty certification in sports medicine, and he maintains his license to practice medicine in California.  (*Id.* at 2; Ex. A, p. 1.)  Currently, Dr. Abrams serves as an associate professor at Stanford University School of Medicine; Director of Sports Medicine for Stanford University varsity athletics; and Director of the Lacob Family Sports Medicine Center at Stanford University.  (Ex. B, p. 1; Ex. A, p. 1.)  His clinical and surgical practice focuses on shoulder pathology.  (Ex. A, p. 1.)  Dr. Abrams has co-authored over 130 peer-reviewed publications.  (*Id.*; Ex. B, pp. 2-14.)

7.)  Although Dr. Abrams acknowledges that sometimes patients will not seek care immediately, he notes that this particular petitioner did not have any difficulty with access to care.  (*Id*. at 7.)

Finally, Dr. Abrams also opines that, apart from her vaccination, petitioner's comorbidity of elevated blood sugar placed her at increased risk for shoulder disorders. (Ex. A, pp. 5, 8.)  Dr. Abrams cites several studies for the proposition that patients with elevated blood glucose are at increased risk of conditions such as bursitis and shoulder stiffness, which is consistent with petitioner's own diagnoses.  (*Id*. at 8 (citing K.M. Shah et al., *Upper Extremity Impairments, Pain and Disability in Patients with Diabetes Mellitus*, 101 PHYSIOTHERAPY 147 (2015) (Ex. A, Tab 4); Charles Milgrom et al., *Risk Factors for Idiopathic Frozen Shoulder*, 10 ISRAEL MED. ASS'N J. 361 (2008) (Ex. A, Tab 5); Michele Abate et al., *Sonographic Evaluation of the Shoulder in Asymptomatic Elderly Subjects with Diabetes*, 11 BMC MUSCULOSKELETAL DISORDERS 1 (2010) (Ex. A, Tab 6)).)  "Unlike many SIRVA cases, we do not have an MRI to further guide the possible causes of petitioner's shoulder pain, but given the finding of her elevated hemoglobin A1c, these alternative diagnose are very possible, especially considering the delayed reporting of shoulder pain as discussed above."  (*Id*.)

## V.     Discussion

### a.  <u>Legal standard for fact finding</u>

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 300aa-11(c)(2).  The special master is required to consider "all . . . relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 300aa-13(b)(1)(A)-(B).  However, the special master is then required to weigh all of the evidence presented.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (concluding that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence).  The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record.  *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (quoting Vaccine Rule 8) (citing § 300aa-12(d)(3)), *aff'd sub nom.*, *LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 416-17.

The Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical

events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule is not absolute. There is no presumption that medical records are accurate or complete as to all of a patient's physical conditions. *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Afterall, "medical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). "[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992). When witness testimony is offered to overcome the weight generally afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent[,] and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). Further, a special master must consider the credibility of the individual offering the testimony. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Additionally, where both parties offer expert evidence, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357,1362 (Fed. Cir. 2000)). Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the ipse dixit of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### b. SIRVA QAI (1) – No history of pain, inflammation or dysfunction of the affected shoulder

The first SIRVA criterion requires that there be no relevant prior history of shoulder concerns (pain, inflammation, or dysfunction) that could explain the post-vaccination presentation (signs, symptoms, examination findings, and/or diagnostic studies). 42 C.F.R. § 100.3(c)(10)(i). That is, the prior history must be one that "would explain" the petitioner's post-vaccination presentation. *Id.* Thus, ambiguous or isolated notations of prior shoulder pain do not prevent a petitioner from meeting this criterion. *E.g., Fry v. Sec'y of Health & Human Servs.*, No. 18-1091V, 2020 WL 8457671, at *3 (Fed. Cl. Spec. Mstr. Dec. 16, 2020). The Table SIRVA criteria "does not necessarily require a spotless prior health history of the affected shoulder." *Kelly v. Sec'y of Health & Human Servs.*, 17-1918V, 2022 WL 1144997, at *17 (Fed. Cl. Spec. Mstr. Mar. 24, 2022); *see also O'Leary, M.D. v. Sec'y of Health & Human Servs.*, No. 18-584V, 2021 WL 4046617, at *8 (Fed. Cl. Spec. Mstr. June 24, 2021) (finding the first SRIVA QAI

11

met where petitioner had a prior remote history of shoulder trauma that had "recovered nicely").

As explained above, although petitioner experienced some shoulder symptoms in January of 2015, petitioner's expert opines that they resulted from an acute cervical radiculopathy distinct from the shoulder pathology she experienced post-vaccination. (Ex. 10, pp. 3-4.)  Consistent with Dr. Natanzi's opinion, petitioner only ever presented for care of these symptoms on one occasion, and her recommended treatment was limited to application of heat, extra strength Tylenol, and home exercise.  (Ex. 4, p. 343.) The only other time this issue was addressed in petitioner's medical records, at a later encounter for a routine physical in April of 2015, it was noted that, while petitioner did still have some arm soreness, she was treating it effectively with heat and exercises and declined further treatment options.  (*Id.* at 324.)  Accordingly, Dr. Natanzi persuasively opines that petitioner's pre-vaccination shoulder symptoms, which occurred five years prior to the vaccination at issue, "cannot explain" the signs and symptoms of structural shoulder pain petitioner experienced post-vaccination.  (Ex. 10, p. 4.)

Respondent argues, however, that Dr. Natanzi should not be considered persuasive in his attempt to distinguish petitioner's pre- and post-vaccination conditions. (ECF No. 36, pp. 11-12.)  In particular, respondent stresses that Dr. Natanzi described cervical radiculopathy as "characteristically caus[ing] pain radiating to the affected distal extremity associated with paresthesia" (*Id.* at 11 (citing Ex. 10, p. 3)), and that petitioner reported experiencing pain in her upper arm even in the absence of neck pain (*Id.* at 12 (citing Ex. 4, pp. 341-42)).  Thus, he contends

> If Dr. Natanzi is correct, then the constant ache in petitioner's left shoulder that persisted even in the absence of radiating pain and paresthesias was unrelated to cervical radiculopathy and, therefore, must have a different etiology.  Alternatively, if Dr. Natanzi is incorrect, and pain caused by cervical radiculopathy is not distinct as he claims, then petitioner's cervical radiculopathy would explain petitioner's post-vaccination shoulder pain.

(*Id.*)  Respondent is not persuasive for several reasons.

First, respondent misstates Dr. Natanzi's opinion.  Although Dr. Natanzi did, as respondent suggests, state that radiating pain with paresthesia is "characteristic" of cervical radiculopathy, his opinion is not fairly read as excluding petitioner's shoulder ache from his assessment of cervical radiculopathy.  (Ex. 10, p. 3.)  Instead, he opined that a radiculopathy is the likely explanation for petitioner's pain on palpation of the deltoid muscle, both because the deltoid is innervated at the C5 and C6 nerve roots and because petitioner's exam was otherwise negative for indicators of shoulder pathology, such as reduced range of motion, reduced strength, or pain with palpation of the shoulder structures.  (*Id.*)  Dr. Natanzi additionally opined that shoulder symptoms referred from the neck are "fundamentally different" from the presence of shoulder pathology.  (*Id.* at 3-4.)  Thus, Dr. Natanzi has explained why he attributed petitioner's

12

2015 shoulder pain, but not her post-vaccination shoulder pain, to her cervical radiculopathy.  (*Id*.)

Additionally, Dr. Abrams's competing opinion on respondent's behalf is equivocal and lacks strength as a refutation of Dr. Natanzi's opinion.  Importantly, Dr. Abrams does not disagree with Dr. Natanzi's opinion that petitioner was suffering a cervical radiculopathy in January of 2015.  (Ex. A, pp. 5.-6.)  Instead, he opines that petitioner's symptomology presents "a mixed picture" that may include shoulder pathology along with cervical radiculopathy.  (*Id*. at 5.)  That mixed picture that Dr. Abrams presents is based only on two complicating considerations – ongoing upper arm pain in the absence of neck pain and an inability to lay on her arm.  (*Id.* at 5-6.)

Dr. Abrams cites Bokshan et al. for the proposition that, while distinguishing the pathology underlying cervical pain and shoulder pain is a "well-known clinical dilemma," practitioners can delineate the two types of condition.  (Ex. A, p. 6 (citing Steven L. Bokshan et al., *An Evidence-Based Approach to Differentiating the Cause of Shoulder and Cervical Spine Pain*, 129 AM. J. MED. 913 (2016) (Ex. A, Tab 1)).)  However, after reviewing this article, I do not see where it supports Dr. Abrams's specific contention that either shoulder pain in the absence of neck pain or the inability to lay on one's arm is dispositive of shoulder pathology.  (Bokshan et al., *supra*, at Ex. A, Tab 1 *passim*.)  Although "dull and aching pain" is considered more consistent with a shoulder pathology (*Id*. at 2), it is not clear from the article overall that these two factors identified by Dr. Abrams are sufficient to diagnose shoulder pathology, especially when considering that Dr. Abrams did not address Dr. Natanzi's explanation that petitioner's physical exam was otherwise negative for significant signs of shoulder pathology.  (Ex. 10, p. 3; *see also* Ex. 4, p. 343.)  Whereas Dr. Abrams cites the Bokshan article to support his contention that petitioner's condition should be viewed as a "mixed picture," the thrust of the article is to support a parsing of the different pathologies.  While the authors describe distinguishing the two pathologies as "challenging" because the anatomic location of reported pain may be misleading, they explain that ultimately only 1 in 10 cervical radiculopathy patients actually have comorbid shoulder pathology despite potentially confusing pain presentations.  (Bokshan et al.*, supra*, at Ex. A, Tab 1, pp. 1-2.)  Dr. Abrams ultimately concluded that it is "difficult to ascertain the source of [petitioner's] pre-vaccination symptoms."  (Ex. A, p. 6.)

Respondent also argues that Dr. Natanzi's opinion is unpersuasive because he did not take account of petitioner's longer-term history.  (ECF No. 36, p. 13.)  Respondent argues that petitioner's later medical records document that she had ongoing issues with osteoarthritis of both the hips and spine, including a notation of arthritic pain affecting the shoulders.  (*Id.* (citing Ex. 4, p. 356; Ex. 3, p. 438).)  Thus, respondent argues that "it appears that petitioner's arthritis of the cervical spine likely contributed to her pre-vaccination shoulder pain, and that a relationship between petitioner's arthritis and her pre-vaccination shoulder pain was acknowledged by petitioner and her primary care providers."  (*Id*.)  In support of this argument, respondent stresses that the Bokshan article supports the proposition that "pain reported in the neck may represent referred pain from the shoulder girdle and vice versa" and that

"symptoms of arm pain (especially atraumatic) should trigger an evaluation of the cervical spine." (*Id*. (quoting Bokshan et al., *supra*, at Ex. A, Tab 1, pp. 1-2).) However, this argument by respondent completely undermines Dr. Abrams's opinion that petitioner's pre-vaccination condition may have presented a "mixed picture" of cervical and shoulder pathologies. (Ex. A, pp. 5-6.) But, in any event, considered in the context of petitioner's medical records as a whole, I am not persuaded by respondent's suggestion that these very few isolated notations evidence a significant ongoing source of shoulder pain. Indeed, the January 7, 2019 encounter record respondent cites explicitly states that petitioner's arthritis was not bothering her and did not require medication. (Ex. 3, p. 438.) Dr. Abrams additionally stresses that petitioner reported left arm symptoms just weeks prior to the vaccination at issue (Ex. A, p. 6 (citing Ex. 3, p. 178).) However, he acknowledges that petitioner's reported symptoms were related to her hand and forearm. (*Id.*) Accordingly, it is not clear how that report of symptoms – which had no apparent further treatment or follow up – evidences any pre-existing shoulder pain or dysfunction.

Finally, Dr. Natanzi also stressed that post-vaccination, petitioner's physical exams demonstrated signs of impingement and reduced range of motion. (Ex. 10, p. 4.) He notes that this is in contrast to her pre-vaccination physical exams. (*Id*. at 3-4.) Moreover, petitioner was newly diagnosed with left shoulder bursitis post-vaccination. (*Id*. at 4; Ex. 5, p. 101.) This is significant because, under the first SIRVA criterion, any confounding history of shoulder pain or dysfunction must "explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." 42 C.F.R. § 100.3(c)(10)(i). By contrast, despite affirmatively agreeing that petitioner was diagnosed with bursitis and shoulder stiffness post-vaccination and that these conditions are "very possible" despite the lack of MRI confirmation (Ex. A, p. 8), Dr. Abrams has not adequately addressed how petitioner's limited potential signs of shoulder pathology (shoulder pain even without neck pain and inability to lay on her arm) would explain her later signs of impingement, reduced range of motion, and diagnosis of bursitis. Notably, having concluded that it is "difficult to ascertain the source of [petitioner's] pre-vaccination symptoms" due to her limited diagnostic evaluation (*Id*. at 6), Dr. Abrams did not even endeavor to characterize the nature of the shoulder pathology he opines was present pre-vaccination. Nor has he adequately explained how a pre-vaccination presentation primarily concerning for cervical spinal condition came to be diagnosed post-vaccination as bursitis. Although petitioner's treating orthopedist later added cervical degenerative disc disease to petitioner's assessment in April of 2021, this was based only on petitioner's x-ray. (Ex. 5, pp. 76-77.) Nothing in that medical record correlates the x-ray findings to petitioner's symptom presentation and the orthopedist explicitly maintained the prior assessment of bursitis. (*Id*. at 77.)

For these reasons, petitioner has met her preponderant burden of proof under the first SIRVA criterion.

14

c.  SIRVA QAI (2) – Pain occurs within the specified time-frame (*i.e.* 48 hours)

The second SIRVA criterion requires that the petitioner experience an onset of shoulder pain within 48 hours of the vaccination at issue.  42 C.F.R. § 100.3(c)(10)(ii). The Vaccine Act explicitly instructs that a special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period."  § 300aa-13(b)(2). However, such a finding must in all events be supported by preponderant evidence.  *Id*.

While petitioner asserts that the onset of her shoulder pain began within 48-hours of her vaccination (ECF No. 34, pp. 14-17; Ex. 2, ¶ 9), respondent argues that the evidence instead preponderates in favor of a finding that the onset of her shoulder pain occurred six or more weeks following the vaccination (ECF No. 36, pp. 8-10). Respondent cites the following from the medical records to support his argument:  (1) Petitioner did not report shoulder pain and physical exam findings were unremarkable at a medical encounter of October 23, 2020, which is approximately 35 days post-vaccination (citing Ex. 3, pp. 163-65); (2) Petitioner later first complained of shoulder pain about 68 days post-vaccination during a virtual medical encounter of November 25, 2020 without specifying onset (citing Ex. 3, p. 156); and (3) When petitioner presented for care on January 5, 2021, the record documented that she had been experiencing pain for 1-2 months, which would place onset in early November at the earliest (citing Ex. 3, pp. 149-50).  (ECF No. 36, pp. 8-9.)  Respondent's review of the medical records is accurate as far as it goes; however, respondent's review of the records is selective. Considering the record as a whole, I find that the record evidence on balance preponderates in favor of an onset of shoulder pain having occurred within 48-hours of vaccination.

The fact that petitioner waited approximately two months to seek care for her shoulder pain is not dispositive of the onset of that shoulder pain.  *E.g., Merwitz v. Sec'y of Health & Human Servs*., No. 20-1141V, 2022 WL 17820768, at *3 (Fed. Cl. Spec. Mstr. Nov. 14, 2022) (explaining that "[d]elay in seeking treatment for a SIRVA injury is not by itself evidence that onset of pain was not immediate"); *Bergstrom v. Sec'y of Health & Human Servs.*, No. 19-0784V, 2020 WL 8373365, at *3 (Fed. Cl. Spec. Mstr. Dec. 4, 2020) (explaining that it is "common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own").  Afterall, "there is no such thing as an 'appropriate' time to seek treatment." *Lang v. Sec'y of Health & Human Servs*., No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020).  Indeed, prior petitioners who waited a similar length of time before pursuing treatment have been compensated.  *E.g., Merwitz*, 2022 WL 17820768, at * 3 (finding SIRVA QAI criterion (ii) met after three-month delay in seeking treatment); *Lang*, 2020 WL 7873272, at *11 (finding SIRVA QAI criterion (ii) met after 11-week delay in treatment); *Williams v. Sec'y of Health & Human Servs*., No. 17-1046V, 2020 WL 3579763, at *6 (Fed. Cl. Spec. Mstr. Apr. 1, 2020) (finding SIRVA QAI criterion (ii) met after five-month delay in seeking treatment).

15

Additionally, although the fact of an intervening medical encounter, such as petitioner's October 23, 2020 encounter, can be probative, *e.g.*, *Porcello v. Sec'y of Health & Human Servs.*, No. 17-1255V, 2020 WL 4725507, at *9-10 (Fed. Cl. Spec. Mstr. June 22, 2020), *mot. for rev. denied*, 152 Fed. Cl. 469 (2020), that too is not necessarily dispositive, *Williams*, 2020 WL 3579763, at *6. In this case, I do not find it to be significant evidence. Whereas respondent noted that the physical exam findings at that encounter were unremarkable (ECF No. 36, p. 8), it is not readily apparent that any examination of petitioner's upper extremities occurred (Ex. 3, p. 164). *See also Kirby*, 997 F.3d at 1383 (concluding that a notation of "Neurological: Not Present – Dizziness" does not evidence a complete neurologic exam); *Tenneson v. Sec'y of Health & Human Servs.*, 142 Fed. Cl. 329, 339-40 (2019) (finding that the special master did not abuse her discretion in determining that emergency department checkmark notations were not sufficient confirmation of a physical exam of the upper extremities). Additionally, though far from definitive, it is noteworthy that during the "Love Call" that petitioner received on the day before this encounter, she was asked "How are you doing today?" and responded "[f]air," (Ex. 3, p. 166), which is in contrast to the two preceding "Love Calls" that had occurred in the weeks prior to her vaccination, at which times she was noted to be "doing well" (*Id.* at 174) and "doing good and doesn't need anything" (*Id.* at 176).

Moreover, petitioner's medical records do demonstrate that petitioner repeatedly and consistently associated her shoulder pain to her vaccination in the context of her treatment for that condition. (Ex. 3, pp. 125, 148, 156; Ex. 5, pp. 73, 98.) This is also probative. *E.g.*, *Khan v. Sec'y of Health & Human Servs.*, No. 17-1831V, 2019 WL 4305815, at * 4 (Fed. Cl. Spec. Mstr. June 28, 2019) (finding it significant that petitioner "explicitly and consistently associated her injury with her flu vaccination to three different medical providers" and explaining of SIRVA cases that "histories of present illness reported by patients may include imprecise or generalized recollections of onset that should not be overanalyzed where they are consistent with the appropriate timeframe"); *see also Tenneson*, 142 Fed. Cl. at 338 (explaining of later treatment records that "Ms. Tenneson's delay in seeking treatment for her shoulder injury does not deprive the records of probative value as to the date Ms. Tenneson began experiencing shoulder pain and disability . . . because they 'contain information supplied to or by health professionals to facilitate diagnosis and treatment . . .'" (quoting *Cucuras*, 993 F.2d at 1528)).

Respondent cites a single instance in which a medical record indicated that the duration of petitioner's shoulder pain was "ongoing for 1-2 months" whereas the vaccination had at that point been more than 3 full months prior. (ECF No. 36, p. 9 (citing Ex. 3, p. 150).) However, this is not dispositive for two reasons. First, the basis for this notation is not clear. This 1-2 month timeframe was not included in the history of present illness that petitioner had provided at this encounter (*see* Ex. 3, p. 148), and, significantly, petitioner's initial report of shoulder pain to this doctor had occurred between one to two months prior to this encounter (*see id.* at 156). Thus, this notation may simply be indicating that the shoulder pain has been "ongoing" since the prior

16

telehealth encounter on November 25, 2020.  Second, when petitioner later reported her history of shoulder pain at her initial physical therapy evaluation, she provided a history that did specify both that the onset of shoulder pain occurred "when" she was received a flu vaccination and that this occurred "in Sept 2020." (*Id.* at 125.)  Although many of the medical record notations are vague as to onset, I interpret the report of "onset of left shoulder [pain] in Sept 2020 when she received a flu shot" to be consistent with an immediate onset as described in petitioner's statement.  (Ex. 2, ¶ 9.)  *E.g., Chen v. Sec'y of Health & Human Servs.*, No. 21-0982V, 2025 WL 1454103, at *6 (Fed. Cl. Spec. Mstr. Apr. 4, 2025) (explaining that while "after" vaccination leaves room for interpretation, "ever since" is fairly understood as meaning onset was immediate); *Williams*, 2020 WL 3579763, at *5 (crediting a notation of "after" vaccination when paired with a notation of "x 3 months" and where other records indicated pain occurred "since, "after receiving," "following," and "very soon after" vaccination).

Respondent also argues that petitioner's later written statement is in conflict with the medical records (ECF No. 36, pp. 9-10); however, this is largely based on his assumption that the medical records preponderantly support an onset in early November, which is not persuasive for the reasons discussed above.

For these reasons, petitioner has met her preponderant burden of proof under the second SIRVA criterion.

   d.   <u>SIRVA QAI (3) – Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered</u>

The third SIRVA criterion requires that the post-vaccination pain and reduced range of motion be limited to the affected shoulder.  42 C.F.R. 100.3(c)(10)(iii).  This requirement encompasses an affirmative showing that the petitioner's presentation included a reduction in range of motion.  *Bolick v. Sec'y of Health & Human Servs.*, No. 20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023).  Otherwise, as I have previously explained at greater length in a prior decision, "the third SIRVA criterion I intended to ensure that SIRVA claims are limited to instances in which 'the condition is localized to the shoulder in which the vaccine was administered.'" *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *12 (Fed. Cl. Spec. Mstr. May 2, 2023) (quoting 82 Fed. Reg. 6294, 6296).)

Although respondent argues, as otherwise addressed above, that petitioner's post-vaccination condition was likely a continuation of her pre-existing cervical spinal condition, respondent's motion response does not include any specific argument that petitioner has additionally failed to meet the third SIRVA criterion.  (ECF No. 36, pp. 8-14.)  Because I do not agree with respondent that petitioner's pre-vaccination condition explains her post-vaccination condition, respondent's arguments relative to the first and fourth SIRVA criteria do not carry over to the third.  Neither respondent nor Dr. Abrams have pointed out any symptoms beyond the shoulder as occurring post-vaccination.  And, ultimately, though he attributed it to diabetes rather than vaccination, Dr. Abrams did agree that petitioner was diagnosed with bursitis post-vaccination and that this

17

condition is "very possible" even though there is no MRI confirmation. (Ex. A, p. 8.) Thus, he appears to agree that a post-vaccination shoulder etiology is discernable for petitioner's pain and reduced range of motion. Dr. Abrams did note that petitioner's reduced range of motion was not evidenced immediately after vaccination (*Id.* at 7); however, no time period is set forth under the SIRVA criteria within in which a petitioner must manifest reduced range of motion. *Accord Dawson v. Sec'y of Health & Human Servs.*, No. 19-278V, 2021 WL 5774655, at *4 (Fed. Cl. Spec. Mstr. Nov. 4, 2021).

For these reasons, petitioner has met her preponderant burden of proof under the third SIRVA criterion.

> e. SIRVA QAI (4) – No other condition or abnormality is present that would explain the patient's symptoms.

The fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv). This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Human Servs.*, 175 Fed. Cl. 673, 680 (2025). While the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Human Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023). Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis. *Durham*, 2023 WL 3196229, at *13-14 (noting that the regulation cites "clinical evidence of" various conditions). Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" his symptoms. *Id*. at *14.

In this case, respondent raises multiple conditions as confounding, specifically: petitioner's prior history of shoulder pain, her documented cervical radiculopathy and spondylosis, and her elevated blood sugar. (ECF No. 36, pp. 10-14.) However, respondent combined his discussion of the first and fourth SIRVA criteria. (*Id.*) Accordingly, the analysis under the first criterion will not be repeated. Respondent's arguments with respect to petitioner's history of shoulder pain and cervical condition do not defeat petitioner's claim under the fourth criterion for the same reasons as discussed above relative to the first criterion.

Here, I further note that, respondent's argument with respect to petitioner's increased blood sugar is not appropriately raised relative to the fourth SIRVA criterion. Dr. Abrams has suggested that diabetes places patients at increased risk of developing shoulder pathology. (Ex. A, p. 8.) He has not suggested that diabetes itself is a condition that would explain shoulder pain. (*Id.*) Moreover, in opining that petitioner was at increased risk of shoulder impairments due to her elevated blood sugar, Dr. Abrams affirmatively asserts that petitioner's own symptoms are explained by her

diagnoses of buritis and shoulder stiffness.  (*Id*.)  These diagnoses are compatible with SIRVA and are the basis by which petitioner's own expert opines that petitioner suffered a SIRVA.  (Ex. 10).

Accordingly, Dr. Abrams's opinion speaks to a potential alternative cause for petitioner's condition rather than the presence of any "other condition or abnormality" that would explain petitioner's symptoms.  In order to have pressed an argument that petitioner's condition is due to diabetes, respondent would have needed to take on the burden of proof with respect to demonstrating that petitioner's condition was due to a factor unrelated to vaccination, *see* § 300aa-13(a)(1)(B), which, as explained below, he did not do.

For these reasons, petitioner has met her preponderant burden of proof under the fourth SIRVA criterion.

### f.  Factor unrelated to vaccination

Once petitioner has met her own prima facie burden of proof, respondent may still demonstrate by a preponderance of evidence that the injury was nonetheless caused by a factor unrelated to the vaccination.  § 300aa-13(a)(1)(B).  In order to meet his burden of proof, respondent must demonstrate by preponderant evidence "that a particular agent or condition (or multiple agents/conditions) unrelated to the vaccine was in fact the sole cause (thus excluding the vaccine as a substantial factor)."  *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347,1354 (Fed. Cir. 2008) (emphasis omitted).  Comparable to what a petitioner must show in a cause-in-fact case, respondent must show a logical sequence of cause and effect linking the injury to the proposed factor unrelated.  *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1368-69 (Fed Cir. 2013).  It need not be scientifically certain but must be legally probable.  *Id*.

In this case, however, although respondent notes that Dr. Abrams identified both cervical radiculopathy and elevated A1c as alternate explanations for petitioner's condition, he cabined his argument to contending that Dr. Abrams's opinion should confound petitioner's own prima facie burden of proof.  (ECF No. 36, pp. 18-19.)  He did not actually argue that Dr. Abrams's opinion is sufficient to meet his own preponderant burden of proof.  Nor, given that I have concluded that Dr. Abrams's opinion does not persuasively counter petitioner's prima facie showing, would I *sua sponte* reach such a conclusion.  In particular, I have concluded as part of the Table analysis that the symptoms constituting petitioner's alleged SIRVA are not likely explained by her cervical spinal pathology.  And, assuming *arguendo* Dr. Abrams did preponderantly demonstrate that elevated blood sugar can cause bursitis, there is no direct support for this conclusion within petitioner's medical records and, by contrast, the close temporal association between onset of petitioner's symptoms and her vaccinations is preponderantly established.

19

## VI.      Conclusion

After weighing the evidence, and considering the record as a whole, I find that petitioner has preponderantly demonstrated that she is entitled to compensation for a Table Injury of SIRVA following her September 18, 2020 flu vaccination.  A separate damages order will be issued.  As explained in the procedural history, that damages order will take the form of an order to show cause why petitioner should not be awarded damages in the amount she has requested.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master

20